IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| TIMOTHY HAYES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 08-0042-CV-W-HFS |
| ALAN H. LANGE, JR., et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

Before the court is defendants' long-pending motion for summary judgment. The moving parties include defendants James Lacey and Alex Monteiro. Defendant, Alan H. Lange, Jr., subsequently moved to join the dispositive motion; permission was granted. In his complaint, plaintiff, Timothy Hayes, asserted claims of defamation and civil conspiracy against defendants Lacey, Monteiro, Lange, and Alexander Larson.[1]

Plaintiff seeks compensatory damages for injury to his reputation, lost income, lost business opportunities, emotional distress, humiliation, and embarrassment. Plaintiff also seeks punitive damages to deter defendants from publishing malicious and reckless statements in the future. For the reasons set forth below, defendants' motion for summary judgment will be granted.

---

[1]Although Alexander Larson is a named defendant, there is no evidence that service has been perfected on this defendant.

Background Facts[2]

On May 10, 2005, Robert Viehouser and defendant Lange incorporated WDL Technologies, Inc. "WDL," a Missouri Corporation. WDL was set up to acquire a software training company and to provide software training and other information technology services. (Complaint: ¶ 8). Plaintiff is a citizen and resident of the United Kingdom, and states that he was previously a United Kingdom Chartered Accountant with 25 years experience developing and managing Information Technology businesses. (Id: ¶¶ 1, 8). Plaintiff and defendant Lange entered into an agreement to establish a business relationship on behalf of WDL. (Id: ¶ 8). Plaintiff states that defendant Lange invited him to join the business as President and CEO. (Id). In or around July of 2005, plaintiff began working from the United Kingdom on behalf of WDL, however, he did not hold a work permit visa, and could not be formally employed in the United States until the visa was obtained. (Id: ¶ 11). In August of 2005, the annual allocation of visas was depleted, therefore, plaintiff would be required to wait until April of 2006, to submit a visa application. (Id).

In September of 2005, WDL hired Richard Hartke to assist with the sales of WDL's software training services. (Id: ¶ 9). Employee Terrance E. Crane also worked for WDL developing training materials for it, as well as for a company named Bradford Learning which provided training materials and offered training courses. (Id: ¶ 10). Defendants Lacey and Larson were owners of Bradford Learning, and WDL intended to use the training materials and resources of Bradford Learning in offering training courses. (Defendants' Supporting Suggestions: ¶ 9). In October of 2005, plaintiff met with Lange Sr., defendant Lange, and Crane, and the parties agreed to appoint plaintiff as CEO of WDL and offered plaintiff 40% of the stock in WDL in return for an investment

---

[2] Defendants have adopted various allegations from the complaint, and where in dispute, will be duly noted.

of up to $50,000 to be contributed by plaintiff and his wife. (Complaint: ¶ 12); defendants claim that plaintiff simply assumed the title of CEO of WDL. (Defendants' SUMF: ¶ 11).

While in the United States, plaintiff traveled to California to meet with defendants Lacey and Monteiro, and a company called KIS, a large Novell reseller based in Silicon Valley. (Complaint: ¶ 13). WDL and KIS subsequently entered into a partnership to provide training to their clients and to share the profits. (Id). WDL and KIS agreed to jointly offer Linux courses at WDL's facility in Independence, Missouri and at KIS's facility in Fremont, California. (Id). In addition to being co-owner of Bradford Learning, defendant Lacey was to be President of the Linux Professional Institute in Canada. (Id).

In October of 2005, plaintiff expressed concern about declining new sales by WDL. (Id: ¶ 14). In November of 2005, plaintiff and his wife paid $20,000 into WDL. (Id). Also, in November of 2005, plaintiff formulated a training partnership program with KIS and other consulting companies to offer training in return for profit shares. (Id: ¶ 15). During the first quarter of 2006, plaintiff continued to be concerned about the lack of sales, and he and Hartke sought to revise the terms of the merger negotiations of WDL and Bradford Learning with defendants Lange and Lacey. (Id: ¶ 18). The parties met in March of 2006, and agreed that defendants Lacey and Larson would sell their stock in Bradford Learning in exchange for 25% and 5% of WDL stock, respectively. (Id: ¶ 19). Plaintiff states that he and his wife invested $60,000 in exchange for 30% stock in WDL (Id); defendants claim that plaintiff's wife owned the shares (Defendants' SUMF: ¶ 28). Hartke invested $50,000 in exchange for 25% stock in WDL. (Complaint: ¶ 19). Defendant Lange acquired the shares of his father, Al Lange, Sr., for a total of 10% of WDL shares. (Id). Plaintiff also states that according to the parties' agreement, he, Hartke, and defendants Lacey and Lange became Directors and Officers of WDL. (Id). Plaintiff further states that defendant Lange accepted responsibility for

all personnel and employment matters including securing the H1B Work PermitVisa for plaintiff. (Id).

In April of 2006, plaintiff returned to the United States to process his visa application, and states that he and Hartke obtained a substantial contract with Beta Sigma Phi "BSP." (Id: ¶ 23).[3] By May of 2006, WDL was again in financial trouble. (Defendants' SUMF: ¶¶ 34-35). Also, in May of 2006, Hartke stated that he could no longer work with defendant Lange, therefore plaintiff and Hartke agreed to terminate defendant Lange's employment contract. (Complaint: ¶ 22). Additionally, in May of 2006, WDL hired defendant, Alex Monteiro, with a title of Vice President of Training Services, although defendants state that he was not considered a formal officer of the company. (Id: ¶ 24; Defendants' SUMF: ¶¶ 40-41). The principal officers at that time were plaintiff, as president, and Hartke, as vice president.

In late May of 2006, plaintiff alleges that while Hartke was out of town, Monteiro signed the visa application on behalf of WDL. (Complaint: ¶ 24). According to defendants, plaintiff approached Monteiro and asked him to sign the application because it needed to be mailed that day and Hartke was out of town. (Defendants' SUMF: ¶¶ 42-45). Monteiro stated that he felt uncomfortable with the request, but signed the paperwork as requested because he felt intimidated. (Id: 46). The paperwork (Exhibit B to Monteiro Affidavit- Exh. 3 to Def. Motion for Summary Judgment) included a Form I-129 which gave plaintiff's title simply as Trainer Consultant, as well as a Labor Condition Application stating plaintiff's salary to be $52,000 annually. (Id: ¶¶ 47-48). The Labor Condition Application indicated plaintiff's future term of employment would be from October 1,

---

[3] Defendants state that plaintiff served as the project manager for a project that BSP hired WDL to perform. Samantha Ulmer worked as the IT Manager of BSP. The project had a time scale of 68 days, with a projected conclusion date of August 30, 2006. The total estimated cost of the project and the total budget allocated by BSP was $136,660. By the end of August, BSP spent most of the allocated budget but the project was not completed.

2006, through September 30, 2009. (Id: ¶ 50). The H-1B application contained a letter dated May 26, 2006, on WDL's letterhead addressed to the Department of Homeland Security stating that WDL offered plaintiff full-time employment for a three year term in the position of Computer Systems Analyst/Trainer. (Id: ¶ 52). Plaintiff alleges that WDL's immigration lawyer, Shazad Ghafoor, did not submit the visa application to the U.S. government. (Id: ¶ 54). Actually, the application was submitted and returned, as subsequently outlined.

On July 7, 2006, defendant Monteiro resigned his employment with WDL stating, among other things, concern about false information on the visa application. (Id: ¶¶ 56-59). By email dated August 22, 2006, defendant Lange gave notice of a special board meeting to address removal of plaintiff from the board of directors because of false statements made on the visa application; the e-mail was addressed to Hartke, plaintiff, and defendant Lacey. (Id: ¶¶ 60-61). By email dated August 24, 2006, addressed to Hartke and defendants Lacey and Lange, plaintiff stated that the visa application was authorized by WDL and that the assertions expressed by Lange in the August 22nd email were defamatory and intended to harm his reputation and personal finances. (Complaint: ¶ 30; Supporting Suggestions: ¶ 64).

On August 27, 2006, defendants Lange, Lacey, Larson, and Monteiro signed a statement addressed to the U.S. Citizenship and Immigration Services (Exhibit C to Monteiro Affidavit - Exh. 3 to Def. Motion for Summary Judgment) containing the assertions expressed in the Lange email of August 22nd. (Complaint: ¶¶ 35-36; Supporting Suggestions: ¶ 65); Hartke did not sign the statement. (Supporting Suggestions: ¶ 66). Plaintiff alleges that by e-mail dated September 11, 2006, defendant Lange gave notice to plaintiff to cease and desist all employment activity on behalf of WDL, and ordered Hartke to leave the premises. (Complaint: ¶ 38). Due to the alleged defamation and slander, plaintiff concluded he could no longer work for WDL, and advised BSP that he could

no longer perform his duties. (Id: ¶ 39). Plaintiff claims that upon his release from employment with WDL, defendants Lange and Monteiro began working with KIS, the training partner of WDL, and the Bradford Learning stock previously owned by defendants Lacey and Larson was returned to them. (Id: ¶ 40). Plaintiff believes that defendant Lange continues to service Beta Sigma Phi in his own business. (Id). Plaintiff claims that the allegedly defamatory statements were told to Hartke, defendant Monteiro, and other WDL employees who heard and read the documents, as well as to representatives of BSP and KIS. (Id: ¶¶ 52-53).

Plaintiff theorizes that defendants conspired to remove him as President and CEO of WDL so that defendants Lange and Monteiro could merge WDL and KIS, and gain employment with KIS, and that defendants Lacey and Larson could regain ownership of Bradford Learning. (Id: ¶ 28).

Standard of Review for Summary Judgment

Rule 56 ( c ) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Bakhtiari v. Beyer, 2009 WL 877884 * 4 (E.D.Mo.). In ruling on a motion for summary judgment, the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. Id. The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Id. Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings, but must set forth specific facts, by affidavit or other evidence,

showing that a genuine issue of material fact exists. Id. Rule 56 ( c ) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id.

Additionally, in summary judgment proceedings, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Brandenburg v. Life and Health Insurance Company of America, 2004 WL 5500119 * 3 (E.D.Mo.); quoting, Fed.R.Civ.P. 56 ( c ). This requirement precludes the consideration of affidavits based on unsupported blanket allegations. Id; citing, Marler v. Missouri State Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir. 1996) (affidavit expressing only plaintiff's belief that defendants acted in vindictive manner insufficient to defeat summary judgment motion).[4]

Defamation

According to plaintiff, defendants conspired to remove him from his position as President and CEO so that defendants Lange and Monteiro could merge WDL with KIS and gain employment with KIS; and so that defendants Lacey and Larson could regain ownership of Bradford Learning. (Complaint: ¶ 28). Plaintiff claims that in furtherance of this plan, on August 18, 2006, defendant

---

[4]See also, Bradley v. Widnall, 232 F.3d 626, 632 (8th Cir. 2000) (plaintiff's speculation that complained-of-mistreatment was due to her protected status was insufficient to defeat properly supported summary judgment motion); Postscript Enter. v. Bridgeton, 905 F.2d 223, 226 (8th Cir. 1990) (affidavit containing only conclusory allegations and no facts that were based on personal knowledge was inadequate to demonstrate existence of genuine issues to survive summary judgment motion).

Lange told Hartke that plaintiff submitted a fraudulent application to INS, and on August 22, 2006, defendant Lange sent an e-mail containing defamatory statements about plaintiff to defendant Lacey. (Id: ¶¶ 29-30). Essentially, defendant Lange stated that plaintiff made false statements in his visa application: (1) by misstating his job title as "Trainer/Consultant;" (2) by misstating that defendant Monteiro was authorized to sign the form; (3) by misstating that the President of WDL was Hartke; and (4) by having defendant Monteiro sign the application in place of Hartke. (Defendants' SUMF: ¶ 61) Plaintiff states that defendant Lange also published these defamatory statements about him to defendants Larson and Monteiro. (Complaint: ¶ 32). On or about August 27, 2006, defendants sent a signed letter expressing these allegations to the INS. (Id: ¶ 35). All told, plaintiff claims that the defamatory statements were heard or read by: defendants Monteiro, Lacey, Lange, and Larson; Hartke; the INS; WDL's immigration attorney Shahzad Ghafoor; plaintiff's wife, ; Al Lange, Sr.; and Terence Crane. (Defendants' SUMF: ¶ 72).

Under Missouri law, to establish a prima facie case for defamation, a claimant must establish six elements: (1) publication; (2) of a defamatory statement; (3) that identifies the claimant; (4) that is false; (5) that is published with the requisite degree of fault: and (6) damages the claimant's reputation. Gray v. AT &T Corp., 357 F.3d 763 (8th Cir. 2004). It has been held that "communications between officers of the same corporation in the due and regular course of the corporate business, or between different offices of the same corporation are not publications to third persons.' " Gray, at 766 (quotations and citation omitted). "The rule rests on the premise that a corporation can only communicate through its employees [with] the writings prepared in the ordinary course of business and distributed within the corporate structure." Id. These intra-corporate communications made in the regular course of business do not constitute publications, because the

communications are made within the corporation itself and not to a third party. Id.

In reliance on the intra-corporate communications exemption, defendants contend that the communications among officers or directors are not considered publications. There is no dispute that Hartke, and defendants Lacey and Lange were officers of WDL, and through their purchased shares were also directors. (Complaint: ¶ 19; Defendants' SUMF: ¶¶ 30-31, 65). Pursuant to WDL's By-Laws, as a shareholder, plaintiff's wife, Margaret Hayes was also considered a director. (Complaint: ¶¶ 12, 14; Defendants' SUMF: ¶¶ 28, 30, 65). Thus, the intra-corporate communications exemption applies as to these individuals, and are nor considered publications to third persons.[5] As to statements made to the INS and attorney Ghafoor,[6] the intra-corporate immunity rule has been sufficiently expanded to apply to statements made to him. Gray, at 766 (Missouri courts have broadly interpreted the intra-corporate immunity rule); see also, Blake v. May Dep't Stores Co., 882 S.W.2d 688, 691 (Mo.Ct.App. 1994) (extending the rule to a department manager with no authority to terminate, discipline or promote). Although not an officer or director, statements made by defendant Monteiro to officers of WDL in his role as an employee also fall within the ambit of the exemption.[7] Lovelace v. Long John Silver's, Inc., 841 S.W.2d 682, 685 (Mo.Ct.App. 1992)

---

[5]Similarly, statements made to Al Lange, Sr. regarding the visa application would be considered within the intra-corporate immunity rule. The evidence shows that Lange, Sr. played an integral role in the management hierarchy of WDL. For example, the minutes of a meeting of shareholders dated March 1, 2006, as well as the minutes of a board meeting dated September 8, 2006, reflect Lange, Sr. as secretary and vice president, respectively. (Plaintiff's Opposition: Exh. F-1; Exh. F-9).

[6]The absence of an affidavit by Ghafoor is noted, notwithstanding plaintiff's stated reliance on the purported guidance and approval of Ghafoor during the completion of the visa application and ensuing process. (Plaintiff's Affidavit: ¶¶ 12-19). The absence of an affidavit by Ghafoor also fails to support plaintiff's contention that defendants' statements regarding the visa application are false. Ghafoor is listed as a witness by defendants.

[7]Plaintiff claims that a question of fact exists as to whether Monteiro was an employee at the time the statements were made. (Plaintiff's Opposition: pg. 6). However, Monteiro has

(concluding three employees' statements to a supervisor alleging another employee made unwanted sexual advances toward the employees fell within the intra-corporate immunity rule). While it is not clear whether Terence Crane was an officer of WDL, defendants state and plaintiff does not dispute that the annual report filed with the Missouri Secretary of State on November 9, 2005, lists Crane on the Board of Directors as Secretary. (Defendants' Supporting Suggestions: ¶ 12). Thus, the intra-corporate immunity rule may be broadly interpreted to include statements made to him regarding plaintiff's visa application. Gray, at 766.[8]

As to plaintiff's allegation of defamatory statements made by defendants to representatives of BSP and KIS (Complaint: ¶¶ 53-54), plaintiff presents no evidence or supporting documentation in support. Therefore, these conclusory allegations, without more, do not defeat a motion for summary judgment. In fact, defendant Lacey has averred that his statements about the visa application were made only to defendants Larson, Monteiro and Lange, and to his wife - a former employee and current director - and the INS. (Defendants' Supporting Suggestions: Exh. 12, ¶ 15). Moreover, he only agreed to contact the INS in order to correct matters in the application in order to protect WDL. (Id: ¶ 16). Holt v. Schweiger Const. Co., 2009 WL 1259966 * 8 (W.D.Mo.) (Missouri's Business Judgment Rule protects officers and directors of a corporation from liability "for intra vires decisions within their authority made in good faith, uninfluenced by any other

---

averred that he resigned as an employee of WDL in July of 2006, but continued in the capacity of a consultant during August and early September of 2006. (Defendants' Supporting Suggestions: ¶¶ 13, 21). Thus, plaintiff's conclusory allegations based on his "understanding" of events (Plaintiff's Affidavit: ¶¶ 20.6-20.7), is insufficient to raise a genuine issue of fact regarding the employment status of Monteiro.

[8]It is noted, however, that while being deposed in the state court case *Margaret Hayes v. WDL Technologies, et al.*, Crane testified that plaintiff initially advised him that he was working on a work visa, and that defendant Lange may have mentioned it. (Defendants' Opposition: Exh. 13).

consideration than the honest belief that the action subserves the best interest of the corporation"). In her affidavit, Samantha Unger, manager of BSP, averred that plaintiff was the assigned project manager to replace the computer system, and he simply stopped working on the project on or around August 31, 2006. (Id: Exh. 9, ¶¶ 2-3, 6, 11). She further averred that although defendants Monteiro and Lange attempted to complete the project, they only informed her that plaintiff no longer worked for WDL; there was no mention of concerns with the visa application. (Id: ¶¶ 14, 16). In conclusion, Unger stated that she had no desire to work with plaintiff in the future due solely to his abrasive and combatant manner. (Id: ¶ 17). Finally, testimony of Sean Canevaro fails to demonstrate that he heard any statements about the visa application or the events incident to it. (Defendants' Supporting Suggestions: ¶ 100-f; Exh: 15).

Plaintiff offers little in the way of rebuttal of defendants' argument as to lack of publication. I am therefore tempted to grant summary judgment to defendants on grounds of non-publication. The Eighth Circuit ruling in Gray v. AT&T Corp., supra, 357 F.3d at 767-769, adopts a view of Missouri law that is quite protective of communications within a business entity, as long as there is communication to those within a "need to know" category. There is little showing here, as plaintiff must establish, that the defamatory material alleged here was being scattered to persons outside an inner circle of business associates, essentially as a matter of gossip that might be considered titillating. Some of the factual background is, however, less certain than one might wish before granting summary judgment on this basis. In particular, the whistle-blowing activity of pressing charges of misinformation with a Government agency has debatable motivation, and therefore may not be privileged if a jury concludes it was intended, at least in part, to drive a coffin-nail into plaintiff's status as the official leader of WDL. I agree with plaintiff that the events in 2006 have some appearance of a school-yard free-for-all, with competitive knifings added to personality

conflicts.

I shall also assume, for present purposes, that plaintiff has made a sufficient showing that there were defamatory statements identifying him. Some damage to reputation will also be assumed, although defendants contest this element of plaintiff's case.

I conclude, however, that there really is no question but that some material mis-statements were made by plaintiff in the application that he fathered, but had Monteiro sign. He himself was the President of WDL and Hartke never held that office. By listing himself as merely a Trainer/Consultant plaintiff concealed his true role. By turning in a timing crisis to an employee who was called a Vice President plaintiff probably misrepresented Monteiro's actual authority. It is my further understanding that plaintiff misrepresented his salary range, more in anticipation than based on prior agreements. For present purposes I will disregard the salary issue (because defendants did not cite it) and the Monteiro authority issue. There was a fabrication, however, as to the top officialdom of WDL. Although plaintiff says he relied on legal advice there is no claim that he informed the lawyer of the true facts regarding the corporate leadership.

I do not see any response by plaintiff to the points just noted, although he seems to belittle their significance. All we can say is that there was apparently no reference of the misstatements to prosecutors. Whether misstatements in a visa application form are criminal in nature is a matter of prosecutorial judgment. Therefore, although plaintiff seems cavalier about the errors inserted in the form, truth as a defense seems clearly established. Summary judgment will be granted to defendants on the defamation claim.

### Civil Conspiracy

As to the cause of action for civil conspiracy, plaintiff claims that defendants "hatched an unlawful plan to oust [him] from WDL." (Complaint: ¶ 57). Plaintiff further claims that defendants

published documents among themselves and to others within the corporate structure as well as to representatives of BSP and KIS resulting in the lost benefit of business associations. (Id: ¶¶ 60, 62). In support of his claim, plaintiff disputes defendant Monteiro's claim of concern about the events surrounding his involvement with plaintiff's visa application because Monteiro did not readily express his concerns. (Plaintiff's Affidavit: ¶¶ 20.4-20.5). Contrary to plaintiff's contention, given defendant Monteiro's stated feeling of intimidation due to his recent hiring, and stated fear of losing his job, it cannot be considered unreasonable that he waited until approached by defendant Lacey about his decision to resign before expressing his concerns. (Defendants' Supporting Suggestions: Exh. 3, ¶¶ 11-15).

Plaintiff questions the veracity of defendant Lacey's stated reasons for finding Monteiro's concerns credible, as well as Lacey's reliance on prior complaints from others regarding plaintiff's less-than-honorable behavior. (Plaintiff's Affidavit: ¶¶ 22- 29).[9] Again, other than plaintiff's subjective beliefs, he provides no support for his contentions that defendants conspired against him for an unlawful purpose.

To recover on a claim of civil conspiracy, a plaintiff must show "a combination of two or more persons to accomplish a purpose that is unlawful or oppressive or to accomplish some [lawful] purpose ... by unlawful, oppressive or other immoral means, to the injury of another." Gibson v. Regions Financial Corp., 557 F.3d 842, 845 (8th Cir. 2009) (citation omitted). At bar, plaintiff has

---

[9]Defendant Lacey states that he developed an unfavorable opinion of plaintiff based on information from his wife, Susan Lacey, that while on a business trip, plaintiff demanded a free or reduced room rate when he received a minor burn from hot water, and made a scene at a restaurant over a minor discrepancy by restaurant staff. (Defendants' Supporting Suggestions: Exh. 12, ¶ 12). Defendant Lacey also noted that plaintiff's behavior became so intolerable, his wife resigned from providing further services to WDL. (Id). Further, Lacey observed first-hand plaintiff's abrasive and domineering behavior with a representative of the Linux Professional Institute during business negotiations. (Id: ¶ 13).

presented no evidence, other than his belief that defendants conspired against him, and this is insufficient to defeat a motion for summary judgment. Id; see also, Muldrow v. Van Meter, 2009 WL 1444442 * 8 (W.D.Ark.) In Muldrow, the Court found that the only evidence the plaintiff offered in support of his conspiracy claim was his belief that Officer Van Meter initiated the traffic stop because he had knowledge of plaintiff's request for information. The Court held that the plaintiff stated no facts to prove his conspiracy claim, and without such facts to demonstrate a genuine issue for trial, the plaintiff's mere allegations could not defeat summary judgment. Id.

Similarly, here, plaintiff claims that the letter to the INS was submitted in an attempt to force him to resign. (Plaintiff's Affidavit: ¶¶ 34-46). However, plaintiff presents no evidence that the statements in the letter were false, other than hearsay statements from attorney Ghafoor that the visa application was completed properly. (Id: ¶ 41). Plaintiff concludes that because the application was returned unopened to Ghafoor, "even if there had been misstatements no crime would hve (sic) been committed." (Id: ¶ 42.4).[10]

Plaintiff next claims that defendant Lange deliberately failed to file the May 2006 list of the Board of Directors - which included plaintiff - with the Missouri Secretary of State so that the prior board of May 2005, composed of defendant Lange, Lange, Sr., and Crane, could remove plaintiff and invalidate the shares of stock held by his wife. (Id: ¶¶ 34-46). However, plaintiff presents no evidence that defendants were plotting as far back as May of 2005, to defame him or somehow improperly relieve him.

The gist of the conspiracy claim is that defendants unlawfully defamed him, and pressured him through defamation to abandon his enterprise. In his response to the motion, plaintiff tacitly

---

[10]Plaintiff admits that his role of "President" was not appropriate for the visa application, and after consulting with immigration attorneys, the application was completed with that alteration. (Plaintiff's Opposition: Exh. D-57).

acknowledges that the defamation claim goes to the essence of the conspiracy claim. (Doc. 39, page 9). Having concluded that truth is a defense to the defamation claim, I agree with defendants that the conspiracy claim necessarily fails. Whether it might be possible to formulate an unlawful conspiracy on some other basis, or to establish a sound claim to recover back investments made, plaintiff has clearly failed to do so in this case. Summary judgment will be granted in favor of defendants.

Accordingly, it is hereby

ORDERED that defendants' motion for summary judgment (ECF doc. 27) is GRANTED. The clerk of the court is directed to issue judgment in favor of defendants, and against plaintiff.

/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

March  22 , 2010

Kansas City, Missouri